the main question, and is a circumstance to be weighed with all his testimony upon the question of his credibility, which was one for the jury. It was shown that the plaintiff did not seek employment from the defendant, but that the latter zealously sought out and persistently urged the plaintiff to enter his employ; that the plaintiff at the time was a member of the union with which the defendant was at war; and that in entering such employment the plaintiff lost his status as a member of the union, and as a security for his faithful performance of the contract was obliged to deposit $300. The jury had a right very properly to consider whether—if the defendant's version was true, that the employment was only by the week—they could have prevailed upon the plaintiff to make these sacrifices for so precarious employment; and they were, it seems to us, strong corroborative circumstances that the plaintiff's agreement was one for a year. Nor do we attach much importance to the admissions claimed to have been made by the plaintiff as to the duration of his employment, it being a fair subject of criticism that at every point a disposition was shown by the defendant's witnesses to establish a weekly, as against a yearly, hiring, which would be unusual if there were no question in their minds at any time as to the duration of the employment. Upon this question there was a clear conflict of evidence, and we do not think we should be justified in setting aside this verdict on the ground that it is clearly against the weight of evidence. For this reason we think the judgment should be affirmed, with costs.

RUMSEY, J., concurs.

---

### STARBUCK v. PHENIX INS. CO. OF BROOKLYN.

(Supreme Court, Appellate Division, First Department. November 13, 1896.)

1. MARINE INSURANCE—PROOF OF SEAWORTHINESS.
A finding that a vessel, which was sunk by water getting in through an open porthole, was seaworthy when she left port is supported by evidence that all the portholes were fastened before she sailed, and that no leak was noticed for over 12 hours after sailing.

2. SAME—WHAT MUST BE PROVED TO AVOID POLICY.
In order to prevent a recovery on a time policy covering a vessel which was seaworthy when first insured, the insurer need not prove that she became unseaworthy through fraud of the owner, but proof of lack of diligence is sufficient.

3. SAME—WHAT CONSTITUTES UNSEAWORTHINESS.
A vessel is unseaworthy when she is so constructed that water coming in through the portholes cannot reach her pumps, and enough to sink her can come in that way. Per Williams, J.

Appeal from trial term, New York county.

Action by William H. Starbuck against the Phenix Insurance Company of Brooklyn, N. Y., on a policy of insurance. A judgment was entered on a verdict in favor of plaintiff, and defendant appeals. Reversed.

Argued before VAN BRUNT, P. J., and WILLIAMS, PATTERSON, O'BRIEN, and INGRAHAM, JJ.

Robert D. Benedict, for appellant.
Artemas H. Holmes, for respondent.

INGRAHAM, J. This action was upon a time policy of insurance whereby the defendant insured the steamer Queen of the Pacific from the 9th day of August, 1887, to the 9th day of August, 1888. The language of the policy is very broad, and generally is against "all other perils, losses, and misfortunes that have or shall come to the hurt, detriment, or damage of the said ship, etc., or any part thereof." It appeared from the evidence that this steamer, being in good order, and apparently properly manned and equipped, sailed on April 29, 1888, at 2 o'clock in the afternoon, from San Francisco for San Diego, Cal. When the ship sailed, there was an ordinary west and northwest wind, and a chopped sea, with a full-sail breeze for a ship. Everything went on well until some time between 2 and half past 2 o'clock the next morning, April 30th, when one of the officers of the ship discovered water coming in from the starboard alleyway. The officers of the ship attempted to stop the leak. The vessel was run ashore, where she sank. She was subsequently raised, when it was found that an after porthole in the starboard alleyway was open, that there were no other holes or breaks in the hull of the vessel, and that the water which caused the vessel to sink must have got in through this open porthole. The evidence is clear that the vessel was properly constructed, the deadlights ample for the purpose, and that, but for the fact that one of the deadlights was open, the vessel was in a perfectly seaworthy condition, both at the time of the issuing of the policy, and from the time she sailed from San Francisco to the time of the sinking. There is, it is true, a claim by the defendant that, in consequence of some error in the construction of the vessel, the water getting into this alleyway was unable to reach a portion of the vessel from which it could be taken up by pumps; and testimony was given of a person who described himself as a "surveyor for Lloyd's Registry British and Foreign Shipping," in which he testified that there should "be two four-inch pipes on the side of the vessel, which would take water far more than the leakage from the alleyway into the hold of the vessel." He further testified that if a vessel had started from San Francisco, and it was found that she had taken in water in the starboard alleyway, and subsequently sank, he would not have passed the ship before these things were done and scuppers fitted, and would not give her a certificate to go to sea. But the witness refused to say, although he was pressed by counsel for the defendant, that the absence of such scuppers would make her unseaworthy; nor does the evidence conclusively show that the vessel did not have such pipes or scuppers. Croghan, one of the witnesses for the plaintiff, did testify that the alleyway had no connection with any part of the ship except through certain doors. He knew of no means of the water getting out except through the doors, and there were no pumps that would reach the water in the alleyway. This seems to have been the only evidence that there was no way for the water

to get to the pumps from this alleyway, but it is not clear that the witness intended to say that he knew of his own knowledge that there were no pipes of any kind in the alleyway. There is no evidence to show that in a properly equipped ship with proper deadlights and hatches there would be a reasonable apprehension of sufficient water entering to make the ship unseaworthy because provision was not made for carrying water from that alleyway to the hold of the vessel. At most, a finding that she was unseaworthy from this cause would be an inference of fact which would be for the jury. The evidence, however, did establish that this loss was caused by water entering this porthole, and that when the vessel was raised it was found that this porthole was open. As before stated, it is not disputed but that the vessel was furnished with proper deadlights to cover those portholes. The assured furnished a competent employé, whose duty it was to look after the deadlights in port, to close the deadlights or portholes as the cargo was placed in the vessel; and this employé swore that he did close and fasten all of the deadlights during the days the vessel was in port prior to her sailing. It seemed that the floor of this alleyway was about a foot above the level of the sea when the vessel sailed, and that the deadlights were between three and four feet above the floor of the vessel. The alleyway was stowed with freight when the vessel sailed. The witness testified that he first closed the glass, which fastens with a screw, which he set up with a key, and then closed the iron backing with two screws, using the same key for both. He swears that all of the deadlights or portholes in the alleyway were in good order at the time, and that he closed the door after fastening the last deadlight. The vessel sailed on April 29th at 2 o'clock. All that day and evening went on as usual until, about between 2 and half past 2 o'clock the next morning, water was noticed leaking from this alleyway; and it was noticed that the vessel had a slight list to starboard. Thus it seems that more than 12 hours had elapsed between the time of the sailing of the vessel before any considerable amount of water leaked in, and that during all that time there was quite a heavy sea, with the vessel rolling considerably; and it was at least a question for the jury to determine as to whether or not, if the portholes had been open when the vessel sailed, water would have been sooner discovered. If the jury believed the evidence of the captain of the hold, who swore positively that he closed and fastened these portholes when the vessel sailed, and believed that she was not unseaworthy because of the arrangement of the pumps, and of there being no opening to allow water to get into the hold, they would be justified in finding a verdict for the plaintiff; and we think it clear, therefore, that the refusal of the court to direct a verdict for the defendant was right.

Counsel for the defendant claims that such a finding would be against the weight of evidence, because there was no possible way by which this porthole could have been opened after the vessel sailed if it was securely fastened before. We have the positive testimony, however, of an uncontradicted witness that he closed

the portholes, and securely fastened them. It is impossible to state just who entered this alleyway after the officer of the ship fastened the porthole. We have a fact, testified to under oath, that the portholes were closed, and securely fastened, before the vessel left San Francisco; and in the face of that testimony it would have been error for the court to hold that the jury were not authorized to believe it, and base their verdict upon it, because the court could not see how the portholes could subsequently become open if the testimony was true.

Several requests to charge were made by counsel for the plaintiff, which were charged by the court, and to which the defendant excepted. One of these requests, we think, requires that there should be a new trial. The plaintiff requested the court to charge:

"If you find that the ship was seaworthy on the 8th of August, 1887, when the policy went into force, the burden of proof is on the defendant, and the defendant must prove that the vessel subsequently became unseaworthy by reason of the willful fraud of the owner or the assured; otherwise plaintiff is entitled to a verdict."

The court, in charging this request, imposed too great a burden upon the defendant. The rule is stated in Berwind v. Insurance Co., 114 N. Y. 234, 21 N. E. 151, 152, as follows:

"In every case of marine insurance by a general policy covering all perils of the sea, where the vessel insured, is in port, there is an implied warranty that the vessel is seaworthy at the inception of the policy. It is a condition precedent to the risk; and, if the vessel is not seaworthy, the policy does not attach. * * * The plaintiffs, under such a policy, make out a prima facie case by showing seaworthiness at the inception of the risk. But in time policies there is implied a warranty that the vessel will be kept in repair and made seaworthy at all times during the continuance of the risk, so far as that is reasonably possible; and this implied covenant imposes upon the insured the duty of active diligence to keep the vessel in good order, and in a seaworthy condition. It is doubtless true that, under a general time policy insuring against all perils of the sea, unseaworthiness subsequent to the attaching of the policy is a defense, the burden of proving which is upon the defendant, and that the plaintiffs need offer no proof thereof as a part of their case."

We think that the most favorable view to the defendant that can be taken upon the evidence in this case is that there was a question for the jury as to whether the vessel was seaworthy at the time of the inception of this risk, and that, if the jury should find that she was, the burden was then upon the defendant of showing that during the continuance of the risk the assured did not exercise active diligence to keep the vessel in good order, and that, in consequence of the failure to exercise such active diligence, the loss occurred, to defeat a recovery. But that is very different from a charge to the jury that the burden is upon the defendant to show that the vessel subsequently became unseaworthy by reason of the willful fraud of the owner or the assured. In fact, there was not a particle of evidence in this case that justified the finding of any fraud on behalf of the assured, or any of its officers, by which this loss was occasioned. The most that could be said was that some one was negligent. There were thus two questions to be submitted to the jury. One was whether the vessel was seaworthy

at the time of the inception of the policy. The burden of proving that fact was upon the plaintiff, and that question was to be determined by the evidence in regard to the absence of some scupper or pipe to the hold of the vessel by means of which water could get to the pumps, and whether, in the absence of such pipes or scuppers, the vessel was unseaworthy. If the jury found that the vessel was unseaworthy, the question then would be whether or not she became so in consequence of the neglect of the plaintiff actively to perform the duty imposed upon him of exercising active diligence to keep the vessel in a good and seaworthy condition. Considering the charge as a whole, we do not think that that question was clearly submitted to the jury in such a way as to obviate the error in granting the plaintiff's request to charge that the defendant must prove unseaworthiness by reason of the willful fraud of the owner, and that there must be a new trial.

The judgment appealed from is therefore reversed, and a new trial ordered, with costs to the appellant to abide the event.

VAN BRUNT, P. J., and PATTERSON and O'BRIEN, JJ., concur.

WILLIAMS, J. (concurring). The action was brought upon a marine insurance policy issued by the defendant. The policy was issued August 8, 1887. The vessel sailed from San Francisco for San Diego, April 29, 1888, and on the following day, April 30, 1888, began taking water, and soon after sank, near Port Harford, Cal., in 25 feet of water. It was subsequently discovered that the water entered the vessel through one of the deadlights in the starboard alleyway, and that the hull of the vessel was uninjured. There was no opening from this alleyway into which the water entered to permit the water to reach the vessel's pumps so it could be removed, and the sinking of the vessel prevented. As the case was tried and submitted to the jury, the verdict of the jury was made to depend upon the seaworthiness of the vessel at the time she sailed, as affected by the open deadlight. There seems to have been no storm or bad weather to affect the vessel or the deadlight. The real questions were whether the deadlight was closed and secured when the vessel sailed, and, if it was, how it came to be open afterwards. There was no dispute but that it was the duty of the owner to have the vessel in a seaworthy condition when she sailed, and, if this duty was not performed, and the loss occurred by reason of the failure to perform such duty, there could be no recovery. It was also agreed that the burden of proof upon this issue of fact was, in this case, upon the defendant, the policy being a time policy. Berwind v. Insurance Co., 114 N. Y. 234, 21 N. E. 151. The defendant claims, however, that in view of the conceded facts in the case, and the charge of the court, the verdict cannot be sustained; that there was no question of fact for the jury, and a verdict should have been ordered for the defendant. The court charged the following propositions: If the deadlight was open when the vessel sailed, she was not seaworthy. If the deadlight

was not sufficiently strong to resist ordinary pressure of the sea in fair weather without opening, she was not seaworthy. If the ship was so constructed that water enough could come in through the deadlight to sink the vessel, because the water could not get to the pumps, she was not seaworthy. That there was no evidence of the fact, and the jury were not authorized to presume, that there had been any willful opening of the deadlight with intent to cause the vessel to leak, after the deadlight had been fastened, and before the sinking of the vessel. That there was no question in the case, under the pleadings and evidence, of barratry of the master or mariners. And then the court submitted to the jury, under the rules it laid down, and upon the evidence in the case, the question whether the vessel was seaworthy when she sailed, telling the jury, if they found she was seaworthy when she sailed, their verdict should be for the plaintiff; if she was not, their verdict should be for the defendant. These were the latest suggestions in the charge to the jury, and must have expressed correctly the views of the court. Under such a charge the verdict certainly cannot be sustained upon the evidence in the case. The jury could not, under these instructions, find that the deadlight was opened by any one intentionally after the vessel sailed. It must have been left open, or improperly secured, at the time she sailed, or her condition must have been such at the time she sailed that the deadlight was forced open by the ordinary pressure of the sea in fair weather. And in either of these cases the vessel was, under the instruction of the court, unseaworthy when she sailed. The defendant asked the court to charge that the open deadlight must be accounted for in one of these two ways, but the court refused to so charge. The court must have had in mind, in refusing this request, an idea suggested in the requests made in behalf of plaintiff, and charged by the court, which, although indefinite and uncertain in the language used, and more or less obscure, evidently were designed to convey the idea that a recovery by the plaintiff would not be defeated by a finding that the vessel became unseaworthy after she sailed and before she sank (that is, during the voyage), as the result of the negligence of the master or crew, in the absence of willful fraud upon the part of the owner or assured, and of such fraud there was no evidence. Under the evidence, however, we are unable to see how it could be presumed (certainly there was no proof of the fact) that, even if, when the vessel sailed, the deadlight was properly closed or secured, and was strong enough to resist the ordinary pressure of the sea in fair weather, yet, through some carelessness or negligence of the master or crew thereafter, the deadlight was opened, and left open. The evidence is quite conclusive and undisputed that the doors of the alleyway were closed up and secured before the vessel sailed, and were not opened again until the vessel had sunk. What carelessness the master or crew could have been guilty of after the vessel sailed, under this evidence, it is difficult to imagine. No suggestion on this subject was made by the court to the jury, and none is made by counsel upon this appeal. Jurors should not be left to speculate and draw upon their imag-

ination. They should be required to act upon the evidence. There was no evidence in the case to authorize them to find the deadlight came open during the voyage, as the result of any negligence on the part of the master or crew after they sailed. As already suggested, the question submitted to the jury was clearly as to the seaworthiness at the time the vessel sailed, and under the charge and upon the evidence there was no basis for the jury to find the vessel was seaworthy when she sailed, but became unseaworthy thereafter, as a result of the negligence of the master or crew. But, beyond this, at least one request was submitted by plaintiff, and charged, which was clearly erroneous, and cannot be so construed as to avoid such error. The jury, by the first request, having been told they must assume the vessel was seaworthy when the policy was issued, August 8, 1887, the court, by the third request, instructed them that the burden of proof was on the defendant, and it must prove she subsequently became unseaworthy by reason of the willful fraud of the owner or assured; otherwise the plaintiff was entitled to a verdict. The vessel did not sail upon the voyage during which the loss occurred until April 29, 1888, more than seven months after the issue of the policy. If the defendant proved the vessel unseaworthy at the time she sailed on this voyage, it was not necessary to prove such unseaworthiness was a result of the willful fraud of the owner or assured. If the charge had been made assuming seaworthiness at the time the vessel sailed, instead of the time the policy was issued, it would have been correct as an abstract proposition. As it was, it was entirely erroneous, and may well have misled the jury in rendering their verdict. In view of the facts in this case and the charge of the court, it was equivalent to saying, the deadlight being closed when the policy was issued, even though it was open when the vessel sailed, still, unless it was so by reason of willful fraud of the owner or assured, plaintiff can still recover. Again, the charge of the court already referred to, that, if the ship was so constructed that water enough could come through the deadlight to sink the vessel, because the water could not get to the pumps, she was unseaworthy, would seem to have precluded a recovery by the plaintiff. That the vessel was so constructed, and in such condition, when she sailed, and that the loss resulted from a failure of the water to get to the pumps, is undisputed. And there was expert evidence to sustain the proposition thus advanced by the court as to such a condition or construction constituting unseaworthiness. We do not think that this verdict should be permitted to stand. Fairness and justice require that jurors should meet the questions submitted to them, and determine them upon the evidence, and obey the instructions of the court as to the law. It is apparent from the most casual reading of the evidence and the charge in this case that the jury, in rendering this verdict, acted upon some improper instruction by the court, or suspicion or speculation or imagination arising in their minds. They could not have decided that the vessel was seaworthy when she sailed, which was really the only question submitted to them. We arrive at the conclusion that the verdict was not supported by the

evidence, that there were errors in the charge that must have misled the jury, and that the judgment entered upon the verdict should therefore be reversed, and a new trial ordered, with costs to abide event.