JAMES A. McALLISTER & Co., Inc., Appellant, *v.* WESTERN ASSURANCE COMPANY OF THE CITY OF TORONTO, Respondent.

JAMES A. McALLISTER & Co., Inc., Appellant, *v.* LIVERPOOL AND LONDON AND GLOBE INSURANCE Co., LTD., OF LIVERPOOL, ENGLAND, Respondent.

First Department, December 17, 1926.

**Insurance — marine insurance — action to recover on marine insurance policies on coal barge — barge was at dock being unloaded by stevedores over which assured exercised no control — method of unloading caused barge to spring leak — possibility of water from sea entering vessel through seams, not voluntarily made by those on board, is peril of sea — peril of sea not limited to violent action of sea.**

The peril of the sea insured against in a marine insurance policy does not necessarily mean peril through violent action of the sea, but includes damage resulting from a leak in an otherwise seaworthy vessel which leak was not caused through the voluntary action of those on board, and although the leak occurred at a time when the boat was at dock.

Accordingly, the defendants are liable on marine insurance policies insuring the plaintiff's coal barge against the perils of the sea, bays and harbors, where it appears that the barge, which was loaded with coal, was at the time it sprang a leak, in the process of being unloaded by stevedores over whom the assured had no control; that the leak was due to the method of unloading; and that the damage consisted not only of the cost of repairing the barge but also of the cost of pumping water from the hold to prevent the barge from sinking.

APPEAL in each of the above-entitled actions by the plaintiff, James A. McAllister & Co., Inc., from a judgment of the Supreme Court in favor of the defendants, entered in the office of the clerk of the county of New York on the 25th day of March, 1925, upon the decision of the court rendered after a trial before the court without a jury at the New York Trial Term.

*Patrick J. Dobson* of counsel [*William J. Martin* with him on the brief; *Foley & Martin*, attorneys], for the appellant.

*Anthony V. Lynch, Jr.*, of counsel [*Park & Mattison*, attorneys], for the respondents.

Dowling, J. These actions were brought to recover on policies of marine insurance issued by defendants on the barge *Peerless*, afterwards renamed the *James F. Brogan*, for damage sustained by it while lying alongside the steamship *King Alexander* on May 11, 1921, at pier 22, borough of Brooklyn, city of New York, into which steamship there was being discharged from the barge a cargo of coal.

The barge in question was a wooden vessel, one hundred and five feet long, of twenty-six feet beam, and twelve feet six inches in depth. She had a tonnage of 752 tons. On the 8th day of May, 1921, with 752 tons of coal on board, she was towed to pier 23, in the borough of Brooklyn, and after lying there was towed alongside the steamship *King Alexander*, lying at pier 22, into which the cargo of coal was to be unloaded by the Auditore Stevedoring Company. The barge at this time was in all respects tight, staunch and seaworthy.

To unload the coal, the stevedores placed in the stern hatch one derrick or unloading bucket, another in the third stern hatch and another in the bow hatch, taking the coal out of the two ends down to the vessel's bottom, leaving the coal in the middle untouched. There is testimony that this would strain a good tight boat and open her seams. It did in fact spring this boat. The captain protested against the method of unloading. The stevedore was not employed by, or under contract with the assured, and the assured had no control over him, and was not privy to the manner or method of unloading. After the unloading had continued for four or five hours the captain first noticed water coming in under the ceiling on the bow, then about fifteen inches deep. He went ashore and telephoned for a tug to pump her out; this was necessary to keep her from sinking. The pumping tug left her pier at nine-thirty-five A. M., went to the slip where the barge was lying and took about thirty minutes from arriving there to get lines out to the leaking barge. When the tug arrived there were five feet of water in the barge. It was then one hour at least from the first discovery of the leak and six hours from the time the unloading began. The tug kept pumping for several hours and was replaced by another. This continued for several days, after which the water was kept down to one foot. The pumping was necessary to keep her from sinking; it is not disputed that if not pumped out she would have sunk.

The damages claimed are for making necessary repairs, saving the vessel from sinking, unloading and transshipping her cargo, removing her to be repaired, rendering services in recovering and securing the vessel and cargo, and for loss of use and other inci-

dental expenses; all to the aggregate amount, as found by the learned trial court, of $4,113.95.

The learned trial court has found that the damage was not due to the failure of the assured or those in charge of the vessel to exercise due diligence to keep and maintain the vessel in a seaworthy condition, but was caused by the opening of the seams of the vessel, and that the seams opened by reason of negligent unloading by the stevedores, which was the proximate cause of the loss. Relief was denied the plaintiff, upon the theory that the loss was not caused by a peril insured against, but by the opening of the seams of the vessel, caused by negligent unloading of her cargo, which was not a peril insured against.

By the policies issued by them herein defendants agreed to " fully indemnify the assured for this Company's proportion of all General Average charges, salvage expenses and loss, damage, detriment or hurt to said vessel for which it may be liable under this Policy, against the adventures and perils of the Harbors, Bays, Sounds, Seas, Rivers, and other waters as above named, and Fires that shall come to the hurt, detriment or damage of said vessel or any part thereof." But they also provide: " It is the intent of this Assurance Company by this Policy to fully indemnify the assured for this Company's proportion of all General Average charges, salvage expenses and loss, damage, detriment or hurt to said vessel for which it may be liable under this Policy, against the adventures and perils of the Harbors, Bays, Sounds, Seas, Rivers, and other waters as above named, and Fires that shall come to the hurt, detriment or damage of said vessel or any part thereof. Excepting always all claims arising from or caused by the following, or other legally excluded causes, viz: From all damage that may be done by the vessel hereby insured to any other vessel or property. From incompetency of the Master or insufficiency of the crew, or from the want of ordinary care and skill in loading and stowing the cargo of said vessel. From rottenness, inherent defects, and other unseaworthiness. From war, invasion, riots or civil commotion, theft, barratry or robbery. From the bursting or explosion of boilers, collapsing of flues, or any injury, derangement or breakage of machinery, unless caused by stress of weather, stranding, collision, or burning. From charges, damage or loss in consequence of seizure or detention for or on account of any illicit or prohibited trade or trade in articles contraband of war, or from the violation of any port regulation. For any claims for wages or provisions furnished to officers or crew while the property insured may be detained by any disaster or during subsequent repairs, excepting always services rendered in the recovery and securing the vessel

or property covered by this Policy. And from anchors being cast without being properly or sufficiently buoyed. From gangways and openings through the deck or sides not being properly secured and protected. And it is understood that no loss is to be paid arising from any negligence in not keeping vessel well pumped out, excepting in case of accident."

The damage to this vessel having been caused by the opening and spreading of her seams, through which river water entered, the first question presented for consideration is, does such a loss constitute one arising as a peril of the sea? It is to be remembered that the learned trial court has found that this vessel was seaworthy and so continued up to the time of the damage to her which occurred through no fault of the assured. Further, that the influx of water was gradual, but so continuous that it required several days' pumping to save her from sinking. In my opinion the possibility of the water from the sea getting into a vessel through its seams or through an opening not voluntarily made by those on board of her, is a peril of the sea. Quotations from English cases will establish, I believe, that the law to that effect is well settled there.

Thus in the case of *The Xantho* [*Wilson, Sons & Co.* v. *Owners of Cargo per the " Xantho"*] (L. R. [1887] 12 App. Cas. 503) Lord HERSCHELL said (at p. 509): " It was contended that those losses only were losses by perils of the sea, which were occasioned by extraordinary violence of the winds or waves. I think this is too narrow a construction of the words, and it is certainly not supported by the authorities, or by common understanding. * * * I am aware of only one case which throws a doubt upon the proposition that every loss by incursion of the sea, due to a vessel coming accidentally (using that word in its popular sense) into contact with a foreign body, which penetrates it and causes a leak, is a loss by a peril of the sea. * * * I think, however, this expression of opinion [*Cullen* v. *Butler*, 5 M. & S. 461] stands alone, and has not been sanctioned by subsequent cases."

In the *Xantho Case* (L. R. 11 P. D. 170) the Court of Appeal, following *Woodley* v. *Michell* (L. R. 11 Q. B. D. 47), had held that as there was no action of the sea or wind causing the collision, it could not be a peril of the sea; but this decision was reversed and *Woodley* v. *Michell* overruled by the House of Lords, Lord BRAMWELL (at p. 513) saying that it is the entry of the sea through a hole that is the peril: " The facts are, that the sea-water flowed into her through a hole, and flowed in such quantities that she sank. It seems to me that the bare statement shows she went to the bottom through a peril of the sea. If the hole had been small,

there being a piece of bad wood, a plank starting, or a similar cause, it would be called a leak, and no one would doubt that she foundered from a peril of the sea. Does it make any difference that the hole was large, and occasioned by collision? I cannot think it does. It is admitted that if the question had arisen on an insurance against loss by perils of the sea this would have been within the policy a loss by perils of the sea." °

That case, as it seems to me, put an end to the contention that to constitute a sea peril there must be some action of the sea, wind or waves, or some natural cause therefor, other than the entry of sea water.

In *Hamilton, Fraser & Co.* v. *Pandorf & Co.* (L. R. [1887] 12 App. Cas. 518) rats had gnawed a lead pipe, thereby letting water into the cargo part of the ship. It was unanimously held, per Lords Herschell, Halsbury, Watson, Bramwell, Fitzgerald and Macnaghten, that this was a peril of the seas. Lord Watson said (at p. 525): " If the respondents were preferring a claim under a contract of marine insurance, expressed in ordinary terms, I should be clearly of opinion that they were entitled to recover."

Lord Halsbury said (pp. 523–524): " One of the dangers which both parties to the contract would have in their mind would, I think, be the possibility of the water from the sea getting into the vessel upon which the vessel was to sail in accomplishing her voyage, it would not necessarily be by a storm, the parties have not so limited the language of the contract; it might be by striking on a rock, or by excessive heat so as to open some of the upper timbers; these and many more contingencies that might be suggested would let the sea in, but what the parties, I think, contemplated was that any accident (not wear and tear, or natural decay) should do damage by letting the sea into the vessel, that that should be one of the things contemplated by the contract."

Lord Herschell said (p. 530) that it had been held in the United States, in *Garrigues* v. *Coxe* (1 Binney [Penn.], 592), that a loss due to a leak occasioned by the eating of rats was covered in a marine policy by the words " perils of the sea," and that he had " no doubt that the loss was one which would in this country be recoverable under a marine policy, as due to a peril of the sea."

In *Cohen, Sons, & Co.* v. *National Benefit Assurance Co.* (K. B. 1924), reported in full in 18 Lloyd's List Law Reports, 199, summarized in 40 Times Law Reports, 347, the insured vessel was a submarine being dismantled while at her dock. Through the negligence of the contractors in charge of the work, parts of the vessel were removed out of the proper order of doing the work, in consequence of which the submarine leaked " in the skin of the ship " at the

points where the parts were removed, filled with water, sank, was raised and the assured sued to recover expenses in attempting to raise her. In holding the loss and expenses due to a peril of the sea and recoverable, Mr. Justice BAILHACHE said: "There is a peril of the sea whenever a ship is afloat in the sea, and water from the sea is unintentionally admitted into her which causes a loss, either to the cargo or to the ship.

" My judgment is that this vessel did suffer a peril of the sea caused by the negligence of somebody working on board; and, there being no warranty against negligence or exception of negligence against it, the defendants are liable whether you look at it as a matter of the ordinary construction of an ordinary marine policy or whether you found your view on the express words written in the policy."

In *Samuel & Co.* v. *Dumas* (L. R. [1924] App. Cas. 431; 18 Lloyd's List L. R. 211) it was held by the House of Lords that where a ship was scuttled in calm weather, with the privity of the owner (not of the assured), no question of barratry being involved, there was no peril of the sea, solely because the willful act of the owner deprived the occurrence of its accidental nature; but it was clearly assumed that, except for the willful nature of the injury, the entry of sea water would be a peril of the sea beyond which the law, in a case of marine insurance, would not look, Lord SUMNER holding that, because of the decided weight of authority (which he reviews), even the willful act of the owner in which the assured did not participate, could not prevent the occurrence being a " peril of the sea."

He said: " Perils of the seas refer to accidents or casualties of the seas, so, evidently, accident or casualty is the point of the definition. Fortuitous, probably, adds nothing to either substantive. A fortuitous casualty is a matter of chance, a mischance; but in causation there is no chance. * * * If the chance refers to something not to be expected and not to be precisely foreseen something may be made of the term." And in the same case Viscount FINLAY said: " There is a marked distinction between such a case as the present and a case where the hole has been made by negligence — *e. g.*, by carelessly leaving a valve open, as in *Davidson* v. *Burnand*, (L. R. [1868] 4 C. P. 117) * * *. That clearly was an accident incident to the carriage of goods, while in the present case the hole was wilfully made  * * * ."

A recent American case is that of *Olympia Canning Co.* v. *Union Marine Ins. Co., Ltd.* (10 F. [2d] 72). The Circuit Court of Appeals assumed that the capsizing of the vessel was due to her tender condition caused by improper loading at the intermediate port, and that this condition rendered her unable to with-

stand "well-known tidal currents" and currents of a "river emptying into the bay" (both usual and ordinary currents usually encountered and which were necessarily to be anticipated and, therefore, not in themselves perils of the seas or insured against). While the court construed the policy (as stipulated therein) under the English law, there is no difference in the questions involved, because both here and in England under a time policy the loss must be caused by a peril of the sea. The court adopted the view of plaintiff-in-error in that case, saying: "The plaintiff in error contends that if a vessel is seaworthy when the policy attaches, and thereafter some unexpected and unforeseen event occurs during the course of the voyage, which changes her condition, which event, in connection with the action of the sea, even if the latter is calm, causes the vessel to founder, the loss occurs from sea perils, and that in the present case the negligent overloading of the vessel was the occurrence of such an unforeseen event."

The prolonged litigation in the case of *Starbuck* v. *Phenix Ins. Co.* (10 App. Div. 198; 19 id. 139; 34 id. 293; 47 id. 621; affd., 166 N. Y. 593) involved the question as to whether the mere entry of sea water through an open port, without any extraordinary, violent or unusual action of the sea (10 App. Div. 199), was a peril of the sea, and it was finally so held (19 id. 139).

I reach the conclusion, based on the foregoing cases and the others discussed in the opinions therein, that it is not necessary that there should be the action of the sea, wind or waves, violent or otherwise, to cause a peril of the sea, but that a truly accidental occurrence, peculiar to the sea, such as the entry of the sea water through the seams of a vessel, which have opened, or through a hole in her hull (neither occurrence happening through design), constitutes a peril of the sea, within the meaning of a policy of marine insurance.

We thus have a case of damage due to a peril of the sea, which was the direct and immediate cause of the damage since the entry of the water threatened the barge with sinking, to prevent which the expenditures in question were incurred. The learned trial court in its opinion said: "Though the entry of the water operated more immediately in producing the disaster, the loss must be attributed to the cause which concededly set in motion without any intervening independent cause. This was the dominant and efficient, the proximate cause." But that cause was also incidental to the very purpose for which the barge was to be used, which required the loading and unloading of cargoes. A mere reading of the exceptions in the policy will show how wide and general must have been the liability for perils of the sea assumed by the insurers,

when it required so many descriptions of exempted classes of perils for which it did not undertake to indemnify.   It is significant that the insurers took care to relieve themselves from claims arising " from the want of ordinary care and skill in loading and stowing the cargo of said vessel," thus showing they would have deemed themselves liable to claims arising therefor, but for this exception. But they failed to relieve themselves from liability for damage from the corelative case of want of ordinary care and skill in unloading the cargo of the vessel which was the cause for the opening of the seams, which was the immediate cause of the entry of the water and the consequent damage.

In *Bird* v. *St. Paul F. & M. Ins. Co.* (224 N. Y. 47) Judge CARDOZO said (at p. 53): " Especially in the law of insurance, the rule is that ' you are not to trouble yourself with distant causes' (WILLES, J., in *Ionides* v. *Univ. Marine Ins. Co.,* 14 C. B. N. S. 289; *Leyland Shipping Co.* v. *Norwich Fire Ins. Society* 1917, 1 K. B. 873, 883, 893).

" ' In an action on a policy, the *causa proxima* is alone considered in ascertaining the cause of loss; but in cases of other contracts and in questions of tort the *causa causans* is by no means disregarded' *(Fenton* v. *Thorley & Co.,* 1903 A. C. 443, 454 * * *).

" The rule ' is based,' it is said, ' on the intention of the parties' *(Reischer* v. *Borwick,* 1894, 2 Q. B. 550)."

Mr. Justice HOLMES said in *Queen Insurance Company* v. *Globe & Rutgers Insurance Co.* (263 U. S. 487), speaking of a policy of insurance on a cargo against war risks (at p. 492): " On the other hand the common understanding is that in construing these policies we are not to take broad views but generally are to stop our inquiries with the cause nearest to the loss.   This is a settled rule of construction, and, if it is understood, does not deserve much criticism since theoretically at least the parties can shape their contract as they like."

In the case of *The Xantho* *(supra,* 510) Lord HERSCHELL said: " Now, I quite agree that in the case of a marine policy the *causa proxima* alone is considered.   If that which immediately caused the loss was a peril of the sea, it matters not how it was induced, even if it were by the negligence of those navigating the vessel. It is equally clear that in the case of a bill of lading you may sometimes look behind the immediate cause."

In the present case the respondents admit in their brief that " the testimony clearly establishes that the entry of water through the seams of the *Peerless* was the immediate cause of her sinking."

I reach the conclusion, therefore, that defendants are liable under their policies of insurance in the case now before us.   There is no

dispute as to the facts in this case, and the amount of plaintiff's recovery has been established by the evidence.

The policy issued by the Liverpool and London and Globe Insurance Company, Ltd., insured the owner of the barge for the sum of $4,125 while that issued by the Western Assurance Company insured the owner of the barge in the sum of $5,875, or a total valuation of $10,000. The amount of the loss alleged was $5,370.50, and as found by the court below, without exceptions by defendants, was $4,113.95. After deducting $100 particular average as provided in each policy, the proportion of the sum of $3,913.95 proved against the Liverpool and London and Globe Insurance Company was $1,614.49, with interest, and against the Western Assurance Company, $2,299.46, with interest.

The judgments appealed from should, therefore, be reversed, with costs, and judgment directed in favor of plaintiff in each action, with costs. Submit order containing findings on notice in conformity with this opinion as proposed by plaintiff to the learned trial court.

CLARKE, P. J., MERRELL, McAVOY and BURR, JJ., concur.

In each case: Judgment reversed, with costs, and judgment directed in favor of the plaintiff, with costs. Submit order containing findings on notice in conformity with opinion, as proposed by plaintiff to the learned trial court.