## THE CAPULIN.

### SPENCER KELLOGG & SONS, Inc., v. UNITED STATES.

(District Court, D. Maryland. April 4, 1924.)

No. 1000.

1. **Shipping ⚖️132(5)—Evidence held to prove seaworthiness and reasonable fitness for cargo.**

   In suit, under Suits in Admiralty Act (Comp. St. Ann. Supp. 1923, §§ 1251¼–1251¼l), for damage to shipment of linseed oil from contact with fuel oil and water, evidence *held* to prove seaworthiness and reasonable fitness for cargo, and loosening of inboard blank, causing damage through operation of ship from cause impossible accurately to determine, for which ship was not responsible.

2. **Shipping ⚖️132(4)—Shipowner had burden of proving seaworthiness.**

   In suit for damage to shipment, under Suits in Admiralty Act (Comp. St. Ann. Supp. 1923, §§ 1251¼–1251¼l), shipowner had burden of proving seaworthiness and reasonable fitness for cargo.

In Admiralty. Libel by Spencer Kellogg & Sons, Inc., against the United States, owner of the steamship Capulin, and others. Libel dismissed.

D. Roger Englar and J. M. Richardson Lyeth, both of New York City, Stuart S. Janney, of Baltimore, Md., Bigham, Englar & Jones and Carter, Ledyard & Milburn, all of New York City, and Janney, Ober, Slingluff & Williams, of Baltimore, Md., for libelant.

George Forbes, of Baltimore, Md., Chester J. Gerkin, of Washington, D. C., and Henry L. Wortche, of Baltimore, Md., for respondents.

SOPER, District Judge. The libelant brings suit under the Suits in Admiralty Act (41 Stat. 525 [Comp. St. Ann. Supp. 1923, §§ 1251¼–1251¼l]), against the United States, as owner of the steamship Capulin, a merchant vessel, for damages in the amount of $100,000 to a shipment of linseed oil from the port of Hull, England, to the port of New York. The oil was put on board in good order at Hull, but when the vessel arrived at New York she wholly failed to discharge a large part of the cargo, and that part which was discharged was damaged from contact with fuel oil and water. The bill of lading was delivered to the shippers, indorsed by them in blank, and in the ordinary course

---

⚖️For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

of business was delivered to the libelant, who thereby became the owner of the cargo.

The loss and damage to the linseed oil was conceded, and the sole question for decision is whether, before the inception of the voyage, the owner of the vessel exercised due diligence to properly equip and outfit the vessel and make it seaworthy and reasonably fit to carry the cargo in question. As to the general seaworthiness of the ship, no issue is raised, nor is there any dispute as to the manner in which the damage occurred. The sole question is whether, in the preparations made to receive the cargo, proper precautions were taken to prevent the accident and loss which ensued.

The steamship was an oil burner, and carried her fuel in double bottom tanks. Above these tanks were deep tanks in which the linseed oil was stowed. A bulkhead, called the "fireroom bulkhead," ran athwartships, and separated the engine and boiler room in the middle of the ship from the double bottom tanks and deep tanks forward. A center line fore and aft bulkhead, which ran forward from the fireroom bulkhead, separated the starboard deep tank from the port deep tank. We are concerned only with the starboard side of the ship. The bottom of the deep tank was the top of the double bottom tank, and through the latter ran the fuel oil pipes to convey the oil to the fireroom. A portion of the deep tank was partitioned off to form a settling tank, into which the fuel oil was pumped and allowed to stand before it was consumed. The settling tank was so situated that the center line bulkhead formed its port side, and the fireroom bulkhead its after side, while the other two sides were erected within the deep tank.

There was a bilge well, 2 feet 6 inches wide and 4 feet deep, which ran athwartships from the ship's side to the center line bulkhead. It was situated in the double bottom, immediately forward of the fireroom bulkhead, and was cut off by a bulkhead on its forward side from the remainder of the double bottom tank. The flooring or bottom of the deep tank extended over to form the top of the bilge well. In the top of the bilge well were three openings leading into the well—a manhole and two strainers to carry off the seepage from the deep tank and from the settling tank; an outward strainer, 8 by 16 inches, located near the starboard side of the ship; and an inboard strainer, 8 by 9 inches, quite close to the starboard side of the settling tank.

Suction and filling pipe lines for the conveyance of fuel oil ran through the double bottom tank beneath the deep tank; thence through the bilge well and the fireroom bulkhead into the fireroom. Before it was used, the fuel oil was pumped from the fireroom into the settling tank. At the beginning of the voyage, the bilge well was filled with water, the deep tank was filled with linseed oil, and in the settling tank was fuel oil, pumped in as needed. There was a suitable cover for the manhole in the top of the bilge well, and the other two apertures or strainers were closed by iron blanks made for the purpose, to prevent the linseed oil in the deep tank from entering the bilge. The blanks were secured with bolts and nuts and canvas gaskets.

On the way across the ocean, an offset of one of the suction and filling fuel oil pipes inside the bilge was broken. Several of the bolts

on the inboard strainer blank became loose, and as a consequence, linseed oil from the deep tank found its way into the bilge. As the result of the operation of the pumps connected with the fuel oil lines, including the broken pipe, fuel oil from the double bottom tank, linseed oil from the deep tank, and water from the bilge were mingled together. There was a flow of the mixture back and forth between the deep tank and the bilge well, and a considerable part of the mixture found its way into the settling tank, and thence to the fireroom, where it was consumed. The remaining linseed oil in the deep tank was contaminated with fuel oil and water.

It is conceded that the ship is not chargeable with neglect because of the breaking of the pipe, which is admitted to have been properly made and properly installed. The officers of the ship and expert witnesses who testified agree that no reasonable precaution could prevent the happening of such an accident, which might readily occur from the ordinary operation of the ship at sea. The weather during the voyage was rough at times, but not extraordinarily so, nor other than might have been expected at any time in a trip across the ocean. Nevertheless it was the opinion of the witnesses that the pipe might have been broken by the working and straining of the vessel in the sea.

But it is contended that the evidence shows that the inboard blank was not properly secured, and that the damage to the cargo is directly traceable to this neglect. Counsel for libelant stated in argument that the simple issue in the case is whether or not the inboard blank was properly riveted. On its part the respondent contends that the same cause which operated to break the pipe, whatever that cause may have been, might have also brought about a loosening of the bolts and nuts on the inboard strainer, and that the ship is not responsible either for the loosening of the plate or for the breaking of the pipe. The determination of this question is decisive of the case. The respondent, to meet the burden on its part, offered testimony of witnesses in great detail to show what was actually done to make the plate tight. The libelant offered expert testimony to the effect that the loose condition of the plate, which was apparent after the removal of the linseed oil at the end of the voyage, showed that the plate was not tight before the voyage began.

Let us consider first the respondent's testimony. On the previous voyage from England to the United States, linseed oil was carried in the deep tank, and wooden blanks were used to cover the strainer openings in the bilge. There was some seepage of oil into the bilge, but no material loss. Attention, however, was drawn to the matter, and new iron blanks were procured in the United States. On June 14, 1922, at London, before the voyage began, the deep tanks were inspected by surveyors on behalf of the shipper to ascertain the fitness of the tanks to carry linseed oil. The tanks were found to be fit so far as cleanliness was concerned. The certificate of survey contains the following passage:

"The double bottom of this tank extends right out to the ship's side and there are no side bilges. There is, however, a cross-bilge with manhole covers, and into which there are two small additional openings in the wings for the purpose of getting at the pump strums. At the time of our inspection,

these small openings had not been closed, the covers having been left off for the purpose of cleaning the cross-bilge on the way round to Hull. The chief engineer informed us that he had double plates for covering these openings all ready and would use every care in putting them on as soon as the bilge was clean. It would be as well, therefore, to advise your cargo supervisors at Hull to see that the closing of these openings has been properly carried out."

In effect, the surveyors passed the ship for the carriage of linseed oil, notwithstanding the arrangement of the bilge and the pipes within the bilge, provided the closing of the blanks was properly carried out. At Hull, before taking on the cargo, the blanks were put in place by the first assistant engineer and first officer of the ship, under the supervision of the chief engineer. It is not denied that the blanks, the bolts and nuts, and the canvas gaskets were adequate for the purpose. The testimony shows that the work was done personally by the first officer and the first assistant chief engineer, and that particular care was used to make certain that the nuts were set up as tight as could be done. The officers who did the work had in mind at the time that it was to be tested by surveyors. In order to determine whether the arrangement of the plates would prevent leakage between the deep tank and the bilge, after the plates were securely put in place, the bilge was filled with water, and also the sounding pipe, 36 feet in length, leading from the bilge to the bridge deck, so that there was a considerable pressure from beneath caused by a head of water.

A small leakage developed at the outward blank, which was remedied by a further tightening of the nuts. There was no leakage at the inboard strainer. The water was left in the bilge and sounding pipe until the next day, June 16th, when surveyors on behalf of the ship appeared to make an examination. Care was taken to see that the sounding pipe was full, only a little additional water being required to fill it. The certificate of the supervisors contains the following passage:

"The vessel loaded under our inspection 798 tons of linseed oil in bulk in the deep tank, which had been cleaned out and passed by shippers' surveyors in London, the two doors to the cross-bilges were put on at this port and properly secured."

In addition to the last-mentioned survey, there seems to have been an examination on the part of some other person whose identity is not established by the testimony. The respondent contends that this person was a surveyor on behalf of the shipper, since shipper's surveyors at London had recommended, as above set out, that the cargo supervisors at Hull should see that the closing of the openings was properly carried out. Counsel for respondent made demand upon counsel for the libelant for the production, if in their possession, of the certificate of the shipper's supervisors at Hull, but libelant's counsel failed to find such certificate, and were unable to state whether such a survey, on behalf of the shipper, was made. Under the circumstances, it is impossible to determine whether such a survey was made or not.

The testimony by the ship's officers was given in considerable detail and with great positiveness, and, in the absence of any circumstances showing it to be improbable, justifies the finding that the blanks were properly secured. While the natural tendency of these witnesses to

maintain the case on behalf of the ship, and to prove the care with which they did the work intrusted to them, should be borne in mind, it is nevertheless true that the work was done with proper materials, by competent and intelligent men, whose attention was especially directed at the time to the purpose for which the plates were applied.

The expert witnesses on behalf of the respondent attempt to meet the direct testimony of the ship's officers by the opinion, positively expressed, that the bolts on the plates could not have been properly hardened and set up, or they would not have become loose during the voyage, and the leakage would not have occurred. They liken the plates on the strainers to manhole covers, and testify that in their experience the bolts of manhole covers do not become slack through the unscrewing of the nuts, if properly set up. They say that, not infrequently, bolted patches on the outside plates of vessels even below the water line, are used with safety as a means of temporary repair. They claim that there was no strain or vibration between the iron plates which formed the top of the bilge well and the blanks which were attached thereto. Where two different parts of a ship are fastened together, the fastening is necessarily subjected to a certain amount of strain, as in the case of holding down bolts of engines, or where structural parts of a ship are bolted together. But the blanks in this case were merely patches on the top of the bilge well, and the bolts had nothing to do but to hold the patches to the top, and there was no strain or vibration between the blanks and the top. Therefore the experts conclude that the inboard blank was not properly bolted in the beginning, since otherwise it could not have become loose.

When confronted with the test of the water pressure at Hull, the experts reply that the test of the inboard blank was not conclusive. The evidence shows that the blank on the outboard strainer was placed on the top of the bilge well, but for purposes of convenience the blank on the inboard strainer was attached beneath the top. Therefore, when the water pressure was applied beneath the blanks, it served to press the outboard blank away from the top of the bilge well, with the result that a slight leak developed and the nuts were tightened again. The water pressure on the inboard blank, on the other hand, was such as to force the blank against the underside of the top of the bilge. If the blank had not been fairly well secured, there would have been some leakage; but, since the blank and the bilge top were pressed together by the water, a small leakage, indicating that the nuts on the blank were not perfectly tight, would not be so likely to occur.

Some difference developed in the testimony as to whether the assistant chief engineer went over the nuts on the inboard strainer after the water test. The testimony is clear that he did this with the nuts on the outboard strainer. The chief engineer testified that the nuts on the inboard strainer were not gone over after the test. Later on, after the respondent's experts had emphasized the difference in the water test as applied to the outboard and to the inboard blank, the chief engineer went on the stand and testified that he was not certain that the assistant chief had not gone over the bolts on the inboard blank after the test. The testimony of the assistant chief engineer, as it was given before the

libelant's experts testified, is not quite clear on the point. It is difficult to tell whether he meant to say that he went over all of the nuts on both blanks after the test. Counsel for libelant carefully refrained from asking the assistant chief the specific question. At the close of all the testimony, the respondent offered to put the assistant chief on the stand again, to testify that he went over all the bolts on both plates after the test; but libelant objected, and the testimony was not received. It is unnecessary to determine the point, because, without this specific bit of testimony, the weight of the evidence demonstrates that the plates were properly secured, unless the opinion of the experts is conclusive that the blank could not have become loose if it had been made tight at the beginning. They themselves do not contend that the water test was without value, even as to the inboard strainer, but urge that the test was not so good on the inboard as it was on the outboard strainer. It is noteworthy that the test was considered satisfactory by the ship's surveyors.

The real basis for the position of libelant's experts is that the blank was not subject to any vibration which could have loosened it. It appears, however, from undisputed testimony in the case, that the inboard blank was attached in such a way as to make it subject to the straining of parts of the vessel. It was located quite close to the angle formed by the side of the settling tank and the fireroom bulkhead. There was an angle stiffener attached to the side of the settling tank, and also to the top of the bilge well, and also an angle stiffener attached to the fireroom bulkhead and to the top of the bilge well. The bolts which attached the inboard blank to the top of the bilge passed, not only through the top of the bilge and the blank, but through these angle stiffeners, so that the forward side of the blank was connected with the settling tank by the stiffener first mentioned, and the starboard side of the blank was connected with the fireroom bulkhead by the other stiffener. These bolts were therefore subject to such strains as might take place during the operation of the vessel between the side of the settling tank and the top of the bilge well on one side, and the fireroom bulkhead and the top of the bilge well on the other. The testimony establishing this construction was given in rebuttal after the close of the libelant's case. It was not in any way denied or disputed. Since the foundation of the testimony of the libelant's experts rests upon the mistaken assumption that there was no connection between the inboard blank and any part of the vessel, except the top of the bilge well, their conclusion that there was no such strain on the blank as would cause the bolts to loosen is of little value. Counsel for libelant advert to the fact that the loose bolts in the blank were not those which passed through the stiffeners, and conclude that the presence of the stiffeners did not contribute to the loosening of the other bolts. This argument is not persuasive, nor were the experts offered to sustain it.

It was suggested in argument, but not seriously contended, that, if the covering of the aperture at the inboard strainer was of such a character that it was likely to be loosened by the operation of the ship in the course of an ordinary voyage, then the respondent had placed itself in the dilemma of not having provided a reasonably fit place for the

reception of linseed oil. The four expert witnesses offered on behalf of the libelant do not offer any opinion to this effect. They were of the opinion that, had the nuts been perfectly tight, the plate secured by the bolts and nuts would have been easily able to withstand the pressure of the linseed oil in the deep tank and would not have become loose, even after the water pressure in the well had been removed.

. It should also be borne in mind that the bolting together of the plate and stiffener was obvious to the expert surveyors, who passed upon it before the vessel sailed from England. The shipper's surveyors inspected the aperture, and surveyors acting on behalf of the ship saw the plate in place. Having in mind the possibility of leakage of oil from the deep tank into the bilge, and desiring to prevent it, they approved the plan adopted.

[1, 2] The finding of the court is that the inboard blank was properly secured in Hull before the cargo was taken aboard; that it became loose through the operation of the ship from some cause impossible accurately to determine, and for which the ship is not responsible. The burden on the part of the ship to show seaworthiness and reasonable fitness for the cargo was met, and the libel must be dismissed.