[No. 26326.  *En Banc.*  August 27, 1937.]

VINCENT LESICICH *et al., Respondents,* v. THE NORTH
RIVER INSURANCE COMPANY, *Appellant.*[1]

[1]Reported in 71 P. (2d) 35.

306

*C. E. H. Maloy,* for appellant.

*Charles T. Peterson,* for respondents.

HOLCOMB, J.—On September 20, 1933, appellant, a New York corporation, issued a marine insurance policy in the sum of twelve thousand dollars to respondent Mrs. Vinka Lesicich as the assured, the owner of a Diesel fishing vessel, the "Helen L," for one year from that date.

The risks insured were thus described:

"TOUCHING the adventures and perils which we, the said insurers, are contented to bear and take upon us, they are of the Seas, Men-of-War, Fire, Enemies, Pirates, Rovers, Thieves, Jettisons, Letters of Mart and Countermart, Surprisals, Takings at Sea, Arrests, Restraints and Detainments of all Kings, Princes and People, of what Nation, condition or quality soever, Barratry of the Masters and Mariners and of all other perils, losses and misfortunes that have or shall come to the hurt, detriment or damage of the said ship, etc., or any part thereof;"

Attached to the policy was a rider designated as California Fishing Vessel Form (1933) containing, among other provisions, an F. P. A. clause reading:

"Warranted free from Particular Average under 3% but nevertheless when the vessel shall have been stranded, sunk, on fire or in collision with another ship or vessel underwriters shall pay the damage occasioned thereby."

And a further provision:

"Warranted by the insured that said vessel shall at all times during the continuance of this policy be tight and staunch.

"Warranted by the insured that said vessel shall at all times during the continuance of this policy be well found in anchors, cable, rigging, tackle and apparel as

is usual and customary; also, in all other things and means necessary and proper for safe navigation according to the usage and custom."

Another part of the policy stipulated that it was subject to English law and usage as to liability for and settlement of any and all claims.

The answer of appellant to the complaint of respondents admitted that it issued a policy of marine insurance and denied all other allegations in the complaint, either directly or upon information and belief. No affirmative matter was specially pleaded by appellant.

The case was tried to the court without a jury, and upon conclusion of the testimony on behalf of respondents, appellant moved for a nonsuit, dismissal of the case, and judgment. These motions were denied.

The position of appellant is that any loss or damage sustained by respondents was not proximately caused by any peril insured; that the loss or damage to the propeller and the towage bill is controlled by the provisions of the F. P. A. clause, because less than three per cent of the insured value of the vessel, and that respondents breached the warranty in § 13 of the California Fishing Vessel Form (1933).

No breach of warranty was affirmatively and specially pleaded by appellant, which was essential to permit that defense in its behalf. *Ferrandini v. Bankers Life Ass'n,* 51 Wash. 442, 99 Pac. 6.

The evidence is undisputed, and, as we consider it, the inferences from such evidence all favor respondents.

The trial court, among other things, found: That, before making the insurance contract, appellant caused the Diesel fishing boat "Helen L" to be surveyed by a surveyor employed by it, who found the boat and all equipment to be in all respects seaworthy; that on

November 6, 1933, while the vessel was engaged in fishing off the coast of California, the net with which the fishing was done was set by the crew; the captain, intending to order the engineer to back up (two bells being the customary signal), which order was given by signaling the engineer by means of a bell operated by a cord, pulled the cord, which broke, thus giving the engineer but one bell, the customary signal to go one-half speed ahead; that, because of the accident, the captain was unable to give the proper signal and the engineer operated same one-half speed ahead, with the result that the vessel was driven into the net, which became entangled in the propeller of the vessel; that thereupon the engineer threw the clutch of the vessel into neutral, turned off the engine, and attempted to turn the propeller and disentangle the net by turning the fly wheel with his hands.

The court further found that, while the engineer was engaged in that occupation, the water taken into the hold with fish deposited therein from the nets, which ordinarily would have been pumped out of the hold by pumps operated by the engine, flooded the engine room; that thereupon the engineer turned on the engine for the purpose of operating the pumps, but that the operation of the engine threw the water which was in the engine room upon the belt operating the pumps, wetting it and causing it to break and become useless; that thereupon the engineer attempted to pump the water out with the auxiliary pumps, which were not designed for pumping water, slime, and fish scales, overtaxing them and breaking them down; that thereupon the crew pumped the water out of the engine room by using hand pumps.

The court further found that, by reason of the foregoing facts, the vessel could not operate, and it was necessary for same to be towed to a place of temporary

safety, where it was discovered that the propeller could not be disentangled from the net until the fish in the hold had been unloaded, for which purpose it was necessary to tow the vessel to a receiving vessel, for which respondents were compelled to pay and did pay $155; that the cost of towage was a general salvage expenditure, for which the distribution of expense is made upon the basis of the hull at $12,000 or 78.534%, net at $3,000 or 19.633% and cargo at $280 or 1.833%, making the sum chargeable to the hull of $121.71.

It was found that, in accordance with the terms of the policy, respondents immediately notified appellant of the accident and damage, and that appellant caused the vessel to be surveyed and the damage thereto ascertained.

It was further found that, by reason of the premises, water got into the clutch of the engine, damaging it to the extent of $267.82; that the propeller was bent and damaged in the sum of $70, and that the pumps were damaged to the extent of $131.88, all of which amounts respondents were compelled to and did pay; that such expenses totalling $469.70, were particular average expenses.

It also found that, as a result of the vessel becoming entangled in the net and as a result of the perils of the seas, the total loss and damage amounted to $591.38.

The court found in accordance with the particular average or general average clause of the policy, heretofore set out, that appellant was liable for the excess of $120 in respect of such accident, or the sum of $471.38.

These repairs were necessary and so found by the surveyor of appellant who examined the ship at San Francisco after the damage. In at least one instance, the cost of repair was less than that estimated by the surveyor. The cost was small as compared with the value of the property insured.

■ The contention of appellant that they cannot be supported as items of recovery under the marine insurance policy because there was no evidence of reasonable value of the repairs is untenable. In one case cited by appellant, *Pitman v. Universal Marine Ins. Co.*, 9 Q. B. D. (Eng.) 192, the writer of the opinion cited and quoted with approval from an old American case decided by Judge Story in 1822, *Peele v. Merchants Ins.* Co., 3 Mason 27, which involved a stranding. Judge Story said:

"The insured is in no case bound to abandon. He may in all cases elect to repair the damage at the expense of the underwriter; and if he acts *bona fide* and with reasonable discretion, there is no decision yet pronounced, which declares that he shall not be entitled to a full compensation, however great it may be, even if it should equal, or even exceed, the original value of the ship. And until such a decision is made, the direct terms of the policy seem strong enough to justify such a claim."

If, however, the costs are so out of proportion to the value of the ship as to show a want of good faith, the cost should not be borne by the underwriter.

The reasoning of those cases is therefore contrary to the contention of appellant.

Our cases, *Torgeson v. Hanford*, 79 Wash. 56, 139 Pac. 648, *Fairbanks Steam Shovel Co. v. Holt & Jeffery*, 79 Wash. 361, 140 Pac. 394, L. R. A. 1915B, 477, and *Richardson & Holland v. Owen*, 148 Wash. 583, 269 Pac. 838, cited to sustain this contention of appellant, are inapt.

The *Torgeson* and *Richardson & Holland* cases involved claims for damages for medical and nurse services, which are professional in character and never allowed in such cases unless the reasonable value has been shown. The *Fairbanks Steam Shovel* case involved the question of a breach of warranty of second-

hand machinery where a large and exorbitant amount was claimed for certain implements without proof of their reasonable value.

█ Clearly, the parties having so stipulated, the rights of these parties must be construed according to the English marine insurance laws and customs. *Delanty v. Yang Tsze Ins. Ass'n*, 127 Wash. 238, 220 Pac. 754.

The law differs somewhat in the construction of time policies of insurance and those covering a marine voyage. The F. P. A. clause in this contract means "warranted free from particular average under 3%, but nevertheless, when the vessel shall have been stranded, sunk, on fire," etc., and is similar to that in *Washington Iron Works v. St. Paul Fire & Marine Ins. Co.*, 128 Wash. 349, 222 Pac. 487, where we reviewed many authorities defining "stranding" or "grounding."

That question, however, is relatively unimportant, since the F. P. A. clause would apply only if the vessel should have been stranded, sunk, or on fire, or in collision with another ship, then the underwriters should pay the damages occasioned thereby over three per cent.

The total damage shown by the undisputed evidence in this case exceeded $360, by reason of which the particular average provision applied. Those items were as found by the trial court in the findings heretofore mentioned.

The salvage item of $155, shown to have been necessary to be paid for towage, was a proper item of recovery. *The Saragossa*, 1 Ben. 551, 21 Fed. Cas. 425; *Ferguson v. Providence Washington Ins. Co.*, 125 Fed. 141.

█ The minor matters have been determined first for the reason that we consider the chief question to be decided is whether this damage was occasioned by

"perils of the sea" as defined by English laws and customs.

We have examined many English cases, as well as several American cases which have reviewed the English cases under the English Marine Insurance Law of 1906. It is not necessary to cite or review all that have been examined.

A recent case nearer home is that of *Olympia Canning Co. v. Union Marine Ins. Co.*, 10 Fed. (2d) 72. Gilbert, J., wrote the opinion in that case reversing the lower court, which had held that the overturning of a vessel under the impulse of tidal and river currents was not a peril of the sea, within a policy providing for adjustment in accordance with the English Marine Insurance Act of 1906, Rule 7, § 55, though the accident would not have occurred but for negligent loading. That case analyzed many English cases and held that, under their laws and decisions, there could be no distinction between loss from an accident happening through the negligence of a crew on the vessel and loss from accident happening from the crew of the vessel on which the loss was occasioned, all such distinctions having been swept aside.

In *McAllister & Co. v. Western Assurance Co.*, 218 App. Div. 564, 218 N. Y. Supp. 658, many English cases are analyzed and the very logical conclusion reached that it is not necessary that there should be action of the sea, wind or waves, violent or otherwise, to cause a peril of the sea, but that a truly accidental occurrence, peculiar to the sea, not happening through design, constitutes a peril of the sea within the meaning of a policy of marine insurance.

The English case of *The Xantho*, decided by the House of Lords, 1887, 12 App. Cas. 503, was quoted with approval, and a statement by Lord Herschell that he agreed

" . . . that in the case of a marine policy the causa proxima alone is considered. If that which immediately caused the loss was a peril of the sea, it matters not how it was induced, even if it were by the negligence of those navigating the vessel."

In *Hamilton, Fraser & Co. v. Pandorf & Co.*, by the House of Lords, 12 App. Cas. 518, Lord Herschell quoted from an American decision in *Garrigues v. Coxe*, 1 Bin. (Pa.) 592, 2 Am. Dec. 493, to the effect that a loss due to a leak occasioned by the eating of rats inside of a vessel was within a marine policy covered by the words "perils of the sea."

In *Atlantic, Gulf and Pacific Co. v. Philippine Islands*, 219 U. S. 17, Mr. Justice Holmes cited *Dudgeon v. Pembroke*, 2 App. Cas. (Eng.) 284, 295, as correctly laying down the principle that, under insurance policies, the courts refuse to look behind the immediate cause of the loss to remoter negligence of the insured. To the same effect is *Charles Clarke & Co. v. Mannheim Ins. Co.*, 210 S. W. (Tex. Com. App.) 528, and cases there quoted; *Bird v. St. Paul Fire & Marine Ins. Co.*, 224 N. Y. 47, 120 N. E. 86, 13 A. L. R. 875, and cases there cited. See, also, 5 Couch Cyclopedia of Insurance Law, 4450, 4455; 1 Arnould on Marine Insurance and Average (10th ed.), 810.

From the foregoing English and American cases, we conclude that the breaking of the bell cord started the succession of events which, because they were at sea, resulted in the damage. What caused the bell cord to break, is unknown, as it was apparently all right until it broke, but we are not to inquire beyond the fact of the breaking. The breaking of the bell cord at the instant it did caused a signal to the engineer the opposite of that intended. Had it caused the vessel to go forward into a rock or pier, when intending to back away from it, it would have been most unquestionably a "peril of

the sea." The vessel having been found to have been seaworthy when the voyage commenced, under all authorities, that condition is presumed to continue until the contrary is shown.

The findings and judgment are correct and are affirmed.

ALL CONCUR.

