[No. 27986.   *En Banc.*   December 10, 1940.]

NATIONAL GROCERY COMPANY *et al., Respondents, v.*
AXEL OLSEN *et al., Appellants.*

W. J. LAKE & CO., INC., *et al., Respondents, v.* AXEL
OLSEN *et al., Appellants.*[1]

[1]Reported in 108 P. (2d) 320.

*C. E. H. Maloy,* for appellants.

*Bogle, Bogle & Gates* and *Claude E. Wakefield,* for respondents.

Steinert, J.—Plaintiffs, comprising two groups of shippers and consignees of certain merchandise which had been loaded for shipment upon a motorboat owned by defendants, brought two actions, subsequently consolidated, to recover their respective damages for the losses sustained by them when the boat capsized and sank while en route from Seattle to Alaska. The consolidated action was tried to a jury, and resulted in a verdict for defendants. On motion of plaintiffs, however, the court entered, in their favor, judgment not-

withstanding the verdict, and from that judgment defendants have appealed.

Respondents alleged in their complaint that the merchandise had been delivered to appellants in Seattle in good condition for shipment by boat to Alaska, and for delivery there in like condition, according to the terms of the bills of lading issued by appellants; that the cargo was totally lost and destroyed in transit; and that appellants were liable for the loss.

In their answer, appellants admitted receipt of the merchandise and the subsequent loss of it, as alleged in the complaint. By way of affirmative defense, however, in so far as material on this appeal, appellants alleged that the contract of affreightment was specifically subject to all the provisions and exemptions of an act of Congress entitled, "An Act relating to the navigation of vessels," etc., 46 U. S. C. A., § 192, 27 Stat. 445, frequently designated as the "Harter act," the material portions of which will be quoted later herein; that appellants had exercised due diligence to render, and had in fact made, the carrying vessel in all respects seaworthy, and that it was properly manned, equipped, and supplied at the time of the commencement of the voyage, as required by the Federal act; that the vessel was then and there fit in all respects to carry the cargo which appellants had undertaken to transport for respondents; and that the vessel, together with its cargo, was lost through fortuitous events constituting what is designated in the law as dangers, or perils, of the sea.

Respondents in their reply denied the affirmative allegations of appellants' answer, and, in addition, affirmatively alleged that appellants' vessel was unseaworthy and unfit for the voyage undertaken (1) because the vessel was overloaded, improperly loaded, and top-heavy; (2) because the vessel was improperly

constructed and equipped, in that its two portholes in the hull below the weather deck did not have iron backers, or shutters, for protection in case the glass within the portholes was broken; and (3) because the vessel did not have on board a licensed pilot.

While there were other issues in the case, the questions presented upon this appeal concern only those above mentioned.

The facts with reference to the occurrence of the shipwreck are not in dispute. The "Ruth C," a motorboat owned by appellants, left Seattle at about 9:30 p. m. on February 8, 1939, bound for Alaska, and carrying a cargo consisting of merchandise owned by respondents. The boat navigated safely, though at times rolling and pitching heavily, through the waters of Puget Sound, the Strait of Juan de Fuca, Haro Strait, Georgia Strait, and Discovery Passage, and at about 1:30 in the morning of February 10th rounded Chatham Point, located on Vancouver Island opposite the junction of Johnstone Strait and Nodales Channel. It was very dark at the time, the weather was "thick," and there were occasional flurries of snow. The sea, however, was relatively calm, although there was some wind. The channel in the vicinity of Chatham Point is regarded as a dangerous place, due to tide conditions, eddies, whirlpools, and drifting logs.

The boat, while rounding Chatham Point, was about three-eighths of a mile off shore, and was moving forward slowly at a speed of not more than three knots per hour. One of the crew, who, as a lookout, was stationed forward of the pilot house, observed a log directly ahead, and called out to the helmsman to swing to port. As the vessel swung in that direction, it took a starboard list, and at the same time became involved in a whirlpool. The helmsman endeavored to bring the boat back to the right, but without success.

The boat continued to veer to port, following the current of the whirlpool. At the same time, it maintained a starboard list to such an extent that the porthole on the starboard side was awash.

While the boat was in that position, a log or some other object from outside, struck and broke the glass in the starboard porthole, and water immediately poured with great force into the hold. The craft was unable to right itself, and, as it filled with water, was brought over on its beam ends. After hurriedly jettisoning a part of the deck cargo in an effort to save the vessel, the crew barely had time to launch and get aboard the lifeboat. They then rowed a short distance away, and stood by to await the outcome. As the boat filled with water, it righted itself momentarily, and then sank by the stern. The vessel with its entire cargo was lost, and the crew took refuge by rowing to a camp on the shore.

Appellants' defense is predicated upon the third section of the Harter act, 46 U. S. C. A., § 192, 27 Stat. 445, referred to above, which provides:

"That if the owner of any vessel transporting merchandise or property to or from any port in the United States of America shall exercise due diligence to make the said vessel *in all respects seaworthy and properly manned, equipped, and supplied,* neither the vessel, her owner or owners, agent, or charterers shall become or be held responsible for damage or loss resulting from faults or errors in navigation or in the management of said vessel nor shall the vessel, her owner or owners, charterers, agent, or master be held liable for *losses arising from dangers of the sea* or other navigable waters, acts of God, or public enemies, or the inherent defect, quality, or vice of the thing carried, or from insufficiency of package, or seizure under legal process, or for loss resulting from any act or omission of the shipper or owner of the goods, his agent or representative, or from saving or attempting

to save life or property at sea, or from any deviation in rendering such service." (Italics ours.)

While "due diligence" is all that is required by the Harter act, it is appellants' contention that the "Ruth C" was, *in fact*, "seaworthy, and properly manned, equipped and supplied;" that the vessel was lost because of "dangers of the sea;" and that they are therefore entitled to exemption from liability. The cause was submitted to the jury upon the basis of that contention, and no issue of "due diligence" is here involved. Respondents' contentions, though more particularized, present the converse of appellants' contention, and are: (1) That the vessel was not seaworthy, for the reasons (a) that it was overloaded, improperly loaded, and top-heavy, and (b) that it was improperly constructed, in that the portholes were not provided with backers, or shutters; (2) that the vessel was not properly manned, in that it did not have on board a licensed pilot; and (3) that, in any event, the loss of the vessel was not caused by dangers, or perils, of the sea. In our discussion, we shall follow the questions as presented by respondents.

The word "seaworthy," as used in the Harter act, means reasonable fitness of a vessel to carry the cargo which the owner of such vessel has undertaken to transport. *The Silvia,* 171 U. S. 462, 43 L. Ed. 241, 19 S. Ct. 7; *The Southwark,* 191 U. S. 1, 48 L. Ed. 65, 24 S. Ct. 1; *Jay Wai Nam v. Anglo-American Oil Co.* (C. C. A. 9th), 202 Fed. 822, 825; *The Jeanie* (C. C. A. 9th), 236 Fed. 463, 468; *The Sagamore* (C. C. A. 2d), 300 Fed. 701, 703; *Spencer Kellogg & Sons v. Buckeye S. S. Co.* (C. C. A. 6th), 70 F. (2d) 146, 148; *Kaufer Co. v. Luckenbach S. S. Co.* (D. C. Wash.), 294 Fed. 978, 979; *Pillsbury Flour Mills Co. v. Becker S. S. Co.* (D. C. N. Y.), 49 F. (2d) 648, 650; *The Fred E. Hasler* (D. C. N. Y.), 51 F. (2d) 779, 781; *Kalbfleisch Corp. v.*

*United States* (D. C. Mass.), 53 F. (2d) 867, 870; *The Point Brava* (D. C. Cal.), 1 Fed. Supp. 366, 367; *The Georgian* (D. C. Fla.), 4 Fed. Supp. 718, 725; Carver's Carriage by Sea, 24, 27, § 18. For an extensive range of definition of the term "seaworthy," see 38 Words & Phrases (Perm. ed.), § 412 *et seq.*

The question whether, upon a particular occasion, a vessel was seaworthy or unseaworthy is a question of fact for the jury or other trier of the fact to determine. *Galle v. Hamburg Amer. Pa. Actien Gesellschaft* (C. C. A. 2d), 233 Fed. 424; *Loveland Co. v. Bethelem Steel Co.* (C. C. A. 3rd), 33 F. (2d) 655; *Rosenberg Bros. & Co. v. Atlantic Transport Co.* (D. C. Cal.), 25 F. (2d) 739; *American Linseed Co. v. United States* (D. C. N. Y.), 40 F. (2d) 657; *The Point Brava* (D. C. Cal.), 1 Fed. Supp. 366.

Upon that issue, the burden of proof is upon the carrier or owner of the vessel to show that the vessel was seaworthy. *International Nav. Co. v. Farr & Bailey Mfg. Co.*, 181 U. S. 218, 45 L. Ed. 830, 21 S. Ct. 591; *The Southwark*, 191 U. S. 1, 48 L. Ed. 65, 24 S. Ct. 1; *The Capulin* (D. C. Md.), 298 Fed. 953; *American Linseed Co. v. United States* (D. C. N. Y.), 40 F. (2d) 657; *The Point Brava* (D. C. Cal.), 1 Fed. Supp. 366.

■ With reference to the loading of the vessel, the evidence was in conflict. However, by a great preponderance, the evidence was sufficient to warrant the jury in finding the following facts: The "Ruth C," built in 1931, was 62.2 feet in length, 16.8 feet in breadth, 8.2 feet in depth, and had a gross weight of 61 tons dead weight. From 1931 until the time of her destruction, she had made five or six trips a year between Seattle and Alaska, carrying freight over the same route as that followed by her on her fatal trip. Many times she had passed through turbulent waters with a deck cargo of from thirty to forty tons, and a

cargo below deck of from fifty to sixty tons. Often the cargo in the well deck was six or seven feet high. She usually carried a cargo of seventy-one tons or more. Although on such occasions she would roll in heavy seas, she never failed to return to an even keel.

The cargo involved in the instant case was loaded by experienced stevedores. The heavier articles were stored in the bottom of the hold, with lighter merchandise on top, and the whole thereof was made tight and secure to prevent its shifting. The same method was followed in stowing the goods in the forecastle and the well deck. The deck cargo was about 3½ feet high at the center of the well deck, and tapered from that point forward, aft, to port, and to starboard. Over the deck cargo was placed a tarpaulin which was made secure by crisscrossing ropes from side to side through the scupper holes. During the process of loading, heavy articles were lifted aboard by use of the boom and gaff, and on such occasions the boat would always return to an even keel, after an initial list, thus indicating her stability. The total cargo weighed seventy-one tons.

The question as to proper loading was one of fact. That question was specifically submitted to the jury under appropriate instructions, and the verdict is therefore conclusive to the effect that the vessel was not overloaded, improperly loaded, or top-heavy.

With reference to proper construction of the boat, the only fault alleged by respondents is that the portholes were not provided with backers, or shutters. The port lights, that is, the glass in the portholes, were seven inches in diameter, were recessed an inch or two from the outside planking of the vessel, and were located immediately above the guard rail. The glass was five-eighths of an inch thick. Although there was some conflict in the evidence as to whether or not the

port lights were adequately protected, the evidence, from both lay and expert witnesses, was overwhelmingly to the effect that while iron backers are used in large vessels whose port lights are ten inches or more in diameter, they are not used or required on smaller vessels where the port lights are of lesser diameter, particularly where such port lights are located in the position, and protected in the manner, shown in the instance of the "Ruth C." The question of proper construction in the respect noted was, again, one of fact. That question was properly submitted to the jury under appropriate instructions, and is now foreclosed by the verdict.

█ The next question presented under respondents' statement of the issues is whether or not the "Ruth C" was properly manned.

The facts are undisputed that the crew consisted of six men, namely, a master, a mate, a purser who was also assistant engineer and seaman, a navigator and seaman, and two deck hands, but that none of those individuals was a licensed pilot.

Respondents do not contend that the failure to have a licensed pilot on board in any manner contributed to the loss of the boat and its cargo, but simply that under the applicable statutes a licensed pilot was required. If respondents be correct in that contention, appellants would not be entitled to the exemption from liability provided by the Harter act, since that act designates proper manning as one of the conditions precedent to the exemption provided therein. The case of *May v. Hamburg etc. Aktiengesellschaft,* 290 U. S. 333, 78 L. Ed. 348, 54 S. Ct. 162, holds squarely that absence of any of the enumerated conditions precedent will deprive the owner of a vessel of the benefit granted by the Harter act, regardless of the lack

of existence of any causal connection between the owner's neglect and the subsequent disaster.

The issue of proper manning thus resolves itself into the single question of whether or not the applicable statutes required the presence of a licensed pilot aboard the "Ruth C".

Respondents rely upon 46 U. S. C. A., § 404, 34 Stat. 193, and 46 U. S. C. A., § 520, 29 Stat. 489. Section 404, approved May 16, 1906 (formerly Rev. Stat. § 4426, approved February 28, 1871), requires that "all vessels of above fifteen gross tons carrying freight or passengers for hire" be navigated with a licensed engineer and a licensed pilot aboard. The "Ruth C," it will be recalled, was sixty-one gross tons in weight. Section 520, approved January 18, 1897, provides that all vessels above fifteen tons burden, carrying freight or passengers for hire, propelled by gas, fluid, naphtha, or electric motors, shall be subject to all the provisions of § 404 requiring engineers and pilots. Although § 520 is retained in 46 U. S. C. A., its provisions, just mentioned, appear to have been superseded by later, similar provisions incorporated in § 404, *supra*. Seᵉ editorial comment following 46 U. S. C. A., § 520.

On June 9, 1910, however, there was approved what is known as the motor boat act, 36 Stat. 462. The first section of that act, 46 U. S. C. A., § 511, provides:

"The words 'motor boat' where used in this chapter shall include every vessel propelled by machinery and not more than *sixty-five feet in length* except tugboats and towboats propelled by steam. The length shall be measured from end to end over the deck, excluding sheer: . . ." (Italics ours.)

The "Ruth C" was only 62.2 feet in length, and was propelled by a Diesel engine. It is undisputed that it was a "motor boat" within the statutory definition.

The motor boat act further provides, in § 5, 46 U. S. C. A., § 515:

"All motor boats carrying *passengers for hire* shall carry one life preserver . . . for every passenger carried, and no such boat while so carrying passengers for hire shall be operated or navigated except in charge of a person duly licensed for such service by the local board of inspectors. . . . *Provided, That motor boats shall not be required to carry licensed officers, except as required in this chapter.*" (Italics ours.)

Assuming that the provision in that section requiring that such boat be not operated or navigated except "in charge of a person duly licensed for such service" means that a licensed *pilot* must be aboard, it is nevertheless obvious, from a reading of the entire section, that it has reference only to motorboats carrying *passengers for hire.* The "Ruth C" carried freight, but no passengers for hire.

Finally, § 9 of the motor boat act (36 Stat. 463), *supra,* provides:

"That all laws and parts of laws only in so far as they are in conflict herewith are hereby repealed." .

The language above quoted from that section does not appear in U. S. C. A.

Respondents' contention proceeds upon the argument that § 404, *supra,* is supplemented by § 520, *supra,* and that, since § 520 is contained in chapter 16 of Title 46, U. S. C. A., entitled "Regulation of Motor Boats," therefore § 515 of the motor boat act, which is also contained in chapter 16, U. S. C. A., must be so harmonized with §§ 404 and 520 as to require all vessels over fifteen gross tons, including motorboats carrying freight, to have licensed pilots aboard.

We do not agree with that argument. In the first place, § 520 was approved nine years before § 404 was enacted in its present form, and, as already stated, it is apparent from a reading of the two sections that the provisions of § 520 were superseded by similar provisions incorporated into § 404. In the next place,

contrary to respondents' argument, although § 520 appears as part of chapter 16 of Title 46, U. S. C. A., under the heading of "Regulation of Motor Boats," it is no part of the motor boat act. It was enacted thirteen years prior to the enactment of the motor boat act. In this connection, it is worthy of note that the codifier of U. S. C. A., in a comment subjoined to § 520, expresses the view that

"The words 'and requiring engineers and pilots' also seem to be superseded by later inconsistent provisions incorporated in section 515 of this title [46 U. S. C. A. § 515], particularly the proviso."

In any event, it is clear to us not only that the motor boat act is independent of both § 404 and § 520, and that § 515 requires, at most, licensed pilots for motorboats only when carrying passengers for hire, but also that the motor boat act, in § 9, quoted above, repeals by implication § 404 (including § 520), to the extent, and with the result, that motorboats, as defined in § 511, are not now required to have licensed pilots when carrying freight only. Whether or not a motorboat, when carrying passengers for hire, is required to have a licensed pilot, as distinguished from "a person duly licensed" for the service of operating and navigating the boat, we are not called upon to decide. It is sufficient to say that the "Ruth C," being governed by the motor boat act, was not required to have a licensed pilot. That conclusion disposes of the sole basis of respondents' contention that the vessel was not properly manned.

■ The final question for determination is whether or not the "Ruth C" was lost as the result of "dangers of the sea." Upon that issue, the burden of proof was likewise upon appellants.

The term "dangers of the sea" or, as it is more frequently designated, "perils of the sea," has been vari-

ously defined. Some of the cases, in formulating a definition of the term, use language of such extreme import as to characterize the event as almost, if not quite, an act of God. For instance, some of them say that the term "perils of the sea" means "something so catastrophic as to triumph over those safeguards by which skillful and vigilant seamen usually bring ship and cargo to port in safety." *The Rosalia* (C. C. A. 2d), 264 Fed. 285; *The Josephine* (C. C. A. 3rd), 49 F. (2d) 207; *The H. A. Rock* (D. C. N. Y.), 23 F. (2d) 198; *The Georgian* (D. C. Fla.), 4 Fed. Supp. 718. Other cases do not go quite so far, but still use language which ordinarily is employed to denote the calamitous. The formula used in those cases, though varying somewhat in different decisions, generally requires that the event be "one of an extraordinary nature, arising from irresistible force, or overwhelming power, and which cannot be guarded against by the ordinary exertions of human skill and prudence." *The Giulia* (C. C. A. 2d), 218 Fed. 744; *The Arctic Bird* (D. C. Cal.), 109 Fed. 167; *The Reeside* (Federal Case No. 11657), 20 Fed. Cases 458.

It would be impracticable, and therefore we will not attempt, to set forth all the definitions that have been assigned to the term "perils of the sea." A variety of definitions will be found in 32 Words & Phrases (Perm. ed.), 42-57.

After a careful consideration of many cases upon the subject, we select and adopt that definition which seems not only to have been widely accepted, but also to be accurate and most consistent with reason and justice. That definition is given in *The Warren Adams* (C. C. A. 2d), 74 Fed. 413, wherein the term "perils of the sea" is said to denote

" ' . . . all marine casualties resulting from the violent action of the elements, as distinguished from

their natural, silent influence, upon the fabric of the vessel; casualties which may, and not consequences which must, occur.' "

To the same effect, see *Davison Chemical Co. v. Eastern Transp. Co.* (C. C. A. 4th), 30 F. (2d) 862; *Aetna Ins. Co. v. Sacramento-Stockton S. S. Co.* (C. C. A. 9th), 273 Fed. 55; *The Manuel Arnus* (D. C. N. Y.), 10 Fed. Supp. 729; *Clinchfield Fuel Co. v. Aetna Ins. Co.*, 121 S. C. 305, 114 S. E. 543.

A similar view of the term "perils of the sea" is expressed, though in somewhat different language, in Carver's Carriage by Sea (8th ed., 1938), 134, § 84, as follows:

" 'Perils of the sea' denotes accidents peculiarly incident to navigating the sea. The words are used in relation to navigation of a ship on the sea, though the accidents contemplated are not all the accidents which may occur during the navigation. They are to be accidents 'of the sea'; that is, arising from the peculiar physical conditions under which navigation upon the sea takes place. Perils of the sea 'really are the perils to which people who carry on their business on that dangerous element are liable because they carry on their business on the sea. They are the perils of the sea, not the perils of journeying.' "

Further on, in the same work, the author, in discussing the view of a former text writer upon the subject, says (p. 138, § 87):

"In Story on Bailments, the following explanation is given (z): — 'The phrase, "perils of the sea," whether understood in its most limited sense, as importing a loss by natural accidents peculiar to that element, or whether understood in its more extended sense, as including inevitable accidents occurring upon that element, must still, in either case, be understood to include such losses only to the goods on board as are of an extraordinary nature, or arise from some irre-

sistible force, or from inevitable accident, or from some overwhelming power, which cannot be guarded against by the ordinary exertions of human skill and prudence.'

"Upon this, it must be remarked that the losses need not be extraordinary, in the sense of arising from causes which are uncommon. Rough seas, which are characteristically sea perils, are common incidents of a voyage. But damage arising from them, whether by their beating into the ship, or driving her on to rocks, is within the exception, if there has been no want of reasonable care and skill in fitting out the ship and in managing her. Again, the existence of rocks which are not generally known to mariners cannot be said to be extraordinary, but a wreck upon such a rock would be a loss by a peril of the sea, if there had been no negligence. So, too, would a stranding upon known rocks, when the vessel has lost her course, owing to fog or other causes, without any want of skill or care."

In this connection, it is worthy of note that in *Duche v. Thomas & John Brocklebank* (C. C. A. 2d), 40 F. (2d) 418, the court gave consideration to the first two definitions given above, and then stated that the phrase "so catastrophic," used in *The Rosalia* case, *supra,* did not add to, nor detract from, what had previously been a "peril of the sea," but left the law as stated in *The Warren Adams* case, *supra.* It will be recalled that the definition which we have accepted and quoted is from the latter case. The opinion in the *Duche* case then proceeds with this significant statement, which might well be made with reference to the case at bar:

"A multiplication of definitions will result only in a multiplication of words without serving any useful purpose. The difficult task is not to define in general terms a peril of the sea, but to determine whether some established facts and circumstances, like those proved in this case, fall within a sound definition. There opinions may be at variance and give to close cases little value as precedents. Yet this situation

obtains largely throughout the whole administration of justice because it is impossible to do away entirely with the human element in applying the law to the facts."

Counsel have cited to us only two cases from this court involving the question of "perils of the sea": *Delanty v. Yang Tsze Ins. Ass'n,* 127 Wash. 238, 220 Pac. 754, and *Lesicich v. North River Ins. Co.,* 191 Wash. 305, 71 P. (2d) 35. While neither of those cases gives a definition of "perils of the sea," both are in accord with the definition which we have herein adopted.

In the *Delanty* case, *supra,* this court held that, where a vessel was seaworthy at the commencement of a voyage, but subsequently developed a leak and sank, the jury was fully warranted in finding that the loss of the vessel was attributable to a "peril of the sea." In the *Lesicich* case, *supra,* the proximate cause of damage to a fishing vessel was held to be the breaking of a bell cord at the instant when the captain was endeavoring to give the engineer the "two bell" signal to propel the craft backward, and, instead, gave the "one bell" signal to go forward. The result was that the vessel was driven forward into a fishing net and became disabled. This court, after an extensive search of the authorities, held that the loss was caused by "the perils of the sea."

In the case at bar, the jury was clearly entitled to find that the loss of the "Ruth C" was attributable to "perils of the sea," as we have heretofore defined that term. It was a marine casualty resulting from the violent action of the elements, as distinguished from their natural, silent influence upon the fabric of the vessel. The jury was likewise entitled to find, as has already been indicated, that the vessel was seaworthy

at the time she left port, and that she was also properly "manned, equipped, and supplied."

The judgment is reversed, with direction to the trial court to enter judgment on the verdict.

ALL CONCUR.

[1]Reported in 108 P. (2d) 365.