**ALLSTATE FINANCE CORPORATION et al., Appellants,**

**v.**

**Irving ZIMMERMAN et al., Appellees.**

**No. 20608.**

United States Court of Appeals Fifth Circuit.

April 16, 1964.

Melvin T. Boyd, Miami, Fla., for appellants.

Clyde Trammell, Jr., Asst. County Atty., Dade County, Darrey A. Davis, County Atty., Gene Essner, Miami, Fla., for appellees.

Before TUTTLE, Chief Judge, and PHILLIPS * and JONES, Circuit Judges.

ORIE L. PHILLIPS, Circuit Judge.

Allstate Finance Corporation [1] brought this action against Zimmerman, Kelly, Thompson and Metropolitan Casualty Insurance Company [2] to recover damages.

At all times herein material Kelly was Sheriff and Thompson was a Deputy Sheriff of Dade County, Florida, and they were sued for acts alleged to have been done by them acting in their capacities as Sheriff and Deputy Sheriff, respectively. At the time of the acts of such officers, Metropolitan was the surety of Kelly on his official bond as Sheriff.

Allstate is the assignee of all the right, title and interest of the Minit Man Automatic Car Wash, Inc.,[3] in two lots and a building located thereon, and all the fixtures in such building, all situated in Dade County, Florida, and of all claims of Minit Man for damages alleged to have been caused thereto by the wrongful acts of the defendants below, other than Metropolitan.

The case came on for trial before a court and jury. Allstate offered its evidence in chief and rested. Thereupon, the jury, under the direction of the court, returned a verdict in favor of all the defendants below. Allstate has appealed.

The evidence, viewed in the light most favorable to Allstate, and a stipulation entered into by the parties afford substantial proof of these facts:

On October 1, 1956, and at all times thereafter herein material, Minit Man, or its successor, Allstate, was the owner of the above-described property, fixtures, and improvements.

During the month of June, 1957, a personal property tax warrant for approximately $300 of delinquent taxes on personal property of Minit Man was issued

---

* Of the Tenth Circuit, sitting by designation.

1. Hereinafter called Allstate.

2. Hereinafter called Metropolitan.

3. Hereinafter called Minit Man.

by Dade County. It was levied only on personal property located on the above-described premises. No attempt was made to levy on any of the real estate. On or about August 5, 1957, Thompson, acting as Deputy Sheriff, held a Sheriff's Sale and at that time sold certain personal property which was located in the building on such premises to Zimmerman for the sum of $34. Thereafter, on or about August 11, 1957, Zimmerman forcibly entered the building located on the premises above described by removing a jalousie, reaching through the opening, and unlocking the door. During a period of approximately 30 days thereafter, Zimmerman dismantled and removed from the building all of the car washing equipment, hereafter more fully described, located therein. None of the property which was dismantled and removed by Zimmerman has been returned to Minit Man or its successor or assignee.

In October, 1956 John Kazanjian of Medford, Massachusetts, a director of Allstate, which then held a mortgage on the above-described property of Minit Man, came to Florida to evaluate such property. The building located on the above-mentioned lots was 96 feet in length and 40 feet in width. It was constructed to house a car wash and was a one-purpose building. Such car wash equipment was then installed in the building. Kazanjian witnessed the car wash in operation at that time by Minit Man. Such equipment included electric wiring, switch boxes, switches, and push buttons entirely adequate for push button operation of the car wash. The wiring and switch boxes were embedded in the walls. There were also six motors. One, a 50 h. p. motor, was housed in a metal frame, bolted to the concrete and was situated nine feet above the floor. It was supported by an angle iron frame, bolted to and embedded in the concrete. Another motor drove the chain that moved the car being washed. One pumped water. Another activated the sprinkler. One started the brushes and another drove the car drying equipment. The motors were rigidly attached to the build-

ing by bolts embedded in the walls or concrete floor. There was plumbing adequate for a push button car washing operation. It included six sprinklers for washing the cars, reservoir tanks, two pumps, and sinks. The pumps were bolted to the concrete floor. The sinks and tanks were fastened to angle irons, which were bolted to the floor, and included water lines and drains connected to the sinks and tanks. The building was in good condition and the equipment was in first class operating condition.

The following personal property was in the building: A cash register, filing cases, polishers, soap, and supplies used in such a car wash operation. Kazanjian appraised and valued the lots at $20,000 and the building and equipment, exclusive of personal property, at $42,000 to $45,000, and the personal property at $6,500.

Kazanjian examined the premises on December 3, 1957, and found these conditions: The wiring and switch boxes had been ripped from the walls, all the pipe connections that let air into the blowers had been pulled out, steel supports for the motors, which were embedded in the concrete, were sawed off at the floor level, the wiring was ripped out, bolts were pulled out, leaving holes in the walls. None of the equipment that had been attached to the building was left therein. All of the car washing equipment that Kazanjian observed there in October, 1956, had been removed from the premises.

Kazanjian testified that the value of the land had not changed from October, 1956, to December, 1957. With the car washing equipment removed, he testified that the value of the building was between $12,000 and $15,000. Allstate replaced the car washing equipment and restored the car washing operation to its original condition at a cost of approximately $31,000.

Zimmerman, called as an adverse witness by Allstate, admitted the following facts: That he was a real estate specialist and knew the difference between real and personal property; he was not cer-

tain exactly what property he purchased at the tax sale, but he conceded that he purchased only personal property. The description of the property to be sold was read off to him before it was offered for sale by the representative of the Sheriff's office. It did not include electrical switch boxes, plumbing fixtures, or other car wash equipment.

After the sale, Sheriff Kelly locked the building and sealed the door. Zimmerman sought to obtain the key to the building and was advised it had been lost. He went to the building on August 11, 1957. Neither Kelly nor Thompson accompanied him. Zimmerman testified that perhaps another Deputy accompanied him, but he was not sure. Thompson testified it was their procedure to send out a Deputy. Zimmerman was accompanied by his maintenance man, a Mr. Zimmer. Zimmer removed a glass jalousie, reached through the opening, and unlocked the door. Zimmerman testified that Thompson told him to enter the building any way he could, but not to damage the building. Zimmerman further admitted that there were electrical wiring, switch boxes, motors, plumbing, sinks, and other equipment in the building; that he employed some colored boys to assist Zimmer in moving the heavy equipment and a transport company to haul it away. He also hired an electrician to remove the electrical equipment. Zimmerman had the electricity turned on and it remained on for three weeks. He dismantled and removed the switch boxes, motors, and other car washing equipment. He hired an electrician to assist in dismantling the equipment and paid him $215 for his services. The work of dismantling and removing the equipment covered a period of about 30 days. When Zimmerman finished removing the equipment, he padlocked the building and threw the key away.

Thompson, called as an adverse witness, testified that neither he nor his deputies nor agents authorized Zimmerman to forcibly enter the building or to remove the jalousie in order to gain admittance, and that he did not authorize Zimmerman to remove any of the car washing equipment above described from the building. He stated that he was authorized only to remove personal property.

I

### The Claim Against
### Kelly, Thompson and Metropolitan

1. The alleged basis of the claim against Kelly, Thompson and Metropolitan was that Kelly was negligent:

(a) In causing a levy to be made upon a greater amount of personal property than was sufficient to satisfy the amount of the tax warrant;

(b) In levying on property that was real and not personal;

(c) In levying on goods not covered by the tax warrant;

(d) In failing to exercise reasonable care with respect to the custody and control of the key with which the building was locked;

(e) In failing to exercise reasonable care in describing the property sold to satisfy the tax warrant;

2. That either Kelly or Thompson authorized Zimmerman to forcibly break into and enter the building;

3. That Thompson failed to use reasonable care in ascertaining what property was covered by the Sheriff's bill of sale to Zimmerman and negligently failed to point it out to Zimmerman.

The proof showed that the levy was made only on personal property and that there was ample personal property in the building to satisfy the warrant.

There was no competent proof that any of the equipment in the building, which was used in the car washing operation, was levied upon or sold to Zimmerman, and there was proof that only personal property was levied on and sold.

There was an inventory made of the property levied upon and the bill of sale, executed by the Sheriff, was delivered to Zimmerman. Neither was introduced in evidence, nor was any showing made

that they were not available. Counsel for Allstate produced a copy of the bill of sale and had it identified, but neither it nor evidence of its contents was introduced. Hence, the proof failed to show any lack of reasonable care in describing the property sold, either in the inventory or the bill of sale or otherwise, or that more personal property was sold than was necessary to satisfy the warrant.

There was evidence that the key with which the building was locked was lost, but no proof that the loss was due to negligence of the Sheriff or any of his Deputies.

There was proof that Thompson or another Deputy named Everett told Zimmerman to enter the building any way he could without damaging it. We think that did not authorize Zimmerman to use physical force to enter the building. Anyway, there was no proof that either Kelly or Thompson undertook to authorize Zimmerman to enter the building forcefully or otherwise.

There was no proof showing that Thompson was charged with the duty of ascertaining and pointing out to Zimmerman personal property he had purchased, or the property covered by the bill of sale. There was no showing that the bill of sale did not adequately describe the personal property sold.

Neither Kelly nor Thompson was present when Zimmerman forcibly entered the building on August 11, 1957.

■ Accordingly, we conclude that the court properly directed a verdict in favor of Kelly, Thompson and Metropolitan.

## II

### The Claim Against Zimmerman

There was proof that in October, 1956, the car wash equipment was installed in the building and was in first class operating condition; that the building was in good condition; and that the rapid car wash was then being operated by Minit Man. How long after October, 1956, Minit Man continued to operate the car wash is not shown, but it was not in operation after August 5, 1957, the date of the sale.

■ Proof of the existence at a particular time of a fact of a permanent nature gives rise to an inference that within logical limits it exists at a subsequent time.[4]

That the building and equipment continued in the condition and of the value, less normal depreciation, that they were in, in October, 1956, until August 11, 1957, is an inference which could be reasonably and logically drawn from the evidence.

Moreover, any change in the condition or value of the equipment removed by Zimmerman between October, 1956, and August 11, 1957, was a fact peculiarly within the knowledge of Zimmerman. Only he knew whether any equipment had been removed from the building after October, 1956, and prior to August 11, 1957. Only he knew of the condition of the equipment on the latter date and a change, if any had occurred, in its condition, other than normal depreciation, that would affect its value.

■ Where the burden of proof of a negative fact normally rests on one party, but the other party has peculiar knowledge or control of the evidence as to such matter, the burden rests on the latter to produce such evidence, and failing, the negative will be presumed to have been established.[5]

Hence, we conclude that there was substantial proof of the value of the building with the car washing equipment installed therein in good working condi-

4. Humble Oil & Refining Co. v. Sun Oil Co., 5 Cir., 191 F.2d 705, 715; Noell v. United States, 9 Cir., 183 F.2d 334, 338; Bludworth v. Bray, 59 Fla. 437, 52 So. 957, 960; Stout v. Haynes, 165 La. 680, 115 So. 823, 824; Wallraff v. W.J.B. Motor Truck Co., 98 N.J.L. 67, 118 A.

743, 744; Lesicich v. North River Ins. Co., 191 Wash. 305, 71 P.2d 35, 39.

5. Campbell v. United States, 365 U.S. 85, 96, 81 S.Ct. 421, 5 L.Ed.2d 428; Henry Hanger & Display Fixture Corp. v. Sel-O-Rak Corp., 5 Cir., 270 F.2d 635,

tion, immediately prior to the removal of such equipment by Zimmerman, in August, 1957, and the value of the building with such equipment removed, immediately after the same had been removed by Zimmerman.

In Greenwald v. Graham, 100 Fla. 818, 130 So. 608, 610, the court laid down the following test for determining whether an article is a fixture:

"* * * first, annexation to the realty, either actual or constructive; second, adaptation or application to the use or purpose to which that part of the realty to which it is connected is appropriated; and third, intention to make the article a permanent accession to the freehold." :

The court further held that the intention of the owner is "to be gathered from his declarations, and from the character, relations, and purposes of the property."

Here, the equipment was firmly attached to the building. It could not be removed without injury to the building. The building was peculiarly designed and built to use such car washing equipment and was a single-purpose building. The condition of the building and the equipment was of a permanent nature. The single use character of the building, the purpose for which the articles were installed, the permanent nature of the installation, the relation between the equipment and the building, the fact that if it was removed it would be necessary for the owner to replace the equipment to make the building usable for its intended single purpose, and the fact that before the building could be used for any other purpose it would have to be substantially modified, and the intention of the owner indicated by such objective facts, all taken together, constituted substantial proof from which the jury could have found that the car washing equipment removed by Zimmerman was fixtures and a part of the building and the freehold.

Accordingly, we conclude that the judgment in favor of Zimmerman should be reversed and the cause remanded, with instructions to grant Allstate a new trial against Zimmerman.

642; Dorsey v. Dorsey, 259 Ala. 220, 66 So.2d 135, 139; Mayo v. Owen, 208 Ga. 483, 67 S.E.2d 709, 712; Southwest Fed. Sav. & Loan Ass'n v. Cosmopolitan Nat. Bank, 23 Ill.App.2d 174, 161 N.E.2d 697, 701; Fitzsimmons v. Gilmore, 134 Neb. 200, 278 N.W. 262, 265; State v. New York Central Railroad Company, 37 N.J.Super. 42, 116 A.2d 800; 805; 31A C.J.S. Evidence § 113, pp. 190–192.